**Reynaldo C. RONDON, Defendant (Petitioner below),**

v.

**STATE of Indiana, Appellee (Respondent below).**

No. 45S00–9403–PD–229.

Supreme Court of Indiana.

May 25, 1999.

---

508

tion[3] and, over the dissents of two justices, the death sentence. *Rondon v. State,* 534 N.E.2d 719 (Ind.1989). Pursuant to Indiana Post–Conviction Rule 1(1), Rondon filed a Verified Petition for Post–Conviction Relief in June, 1990. He filed a Second Amended Petition in February, 1995. Post-conviction relief was denied after an evidentiary hearing. Rondon appeals this negative post-conviction judgment pursuant to Indiana Post–Conviction Rule 1(7).

Rondon raises several issues on appeal which we consolidate and restate as follows: whether the mental retardation exemption[4] from the death penalty applies in this case; whether Rondon received ineffective assistance of trial and appellate counsel; whether Rondon was denied a fair post-conviction forum; and whether the cumulation of alleged errors warrants relief. We conclude that Rondon received ineffective assistance of trial counsel at the penalty phase. We reverse Rondon's death sentence and remand for a new penalty phase and sentencing hearing.

Judith C. Menadue, Elkhart, Indiana, Thomas M. Carusillo, Indianapolis, Indiana, Attorneys for Appellant.

Richard A. Waples, Indiana Civil Liberties Union, Indianapolis, Indiana, Lawrence A. Vanore, Sommer & Barnard, P.C., Indianapolis, Indiana, Attorneys for Amicus Curiae.

Pamela Carter, Attorney General of Indiana, Arthur T. Perry, Deputy Attorney General, Office of Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

## ON APPEAL FROM THE DENIAL OF POST–CONVICTION RELIEF

SELBY, J.

In 1985, Appellant Reynaldo C. Rondon was convicted of murder[1] and felony murder[2] and was sentenced to death. On direct appeal, we affirmed the felony murder convic-

*FACTS*

The following is a brief summary of the facts published on direct appeal in *Rondon v. State,* 534 N.E.2d 719, 722–23 (Ind.1989). On October 10, 1984, Frank Alarcon's neighbor heard several loud noises coming from outside Alarcon's home late at night. The next day the neighbor went to Alarcon's house and noticed that several things seemed out of place. When he called through the open back door and received no answer, he called the police. The police arrived to find that eighty-two-year-old Alarcon had been stabbed to death. An autopsy report revealed that Alarcon was stabbed fifteen times.

One witness identified Rondon in a line-up and in court as the driver of Alarcon's stolen car on the night of the murder. Further, when the police questioned Rondon's live-in girlfriend, she became upset and told the

---

1. IND. CODE § 35–42–1–1(1) (1998).

2. IND CODE § 35–42–1–2(2) (1998).

3. Also on direct appeal, we instructed the trial court to merge the murder conviction into the

felony murder conviction. *Rondon v. State,* 534 N.E.2d 719 (Ind.1989).

4. IND. CODE §§ 35–36–9–6, 35–50–2–9 (1998).

police that Rondon recently had given her two knives. She also testified to a conversation she overheard between Rondon and his co-defendant in which the two men planned to rob the victim. When she asked what they would do if they were caught, Rondon stated that he would kill Alarcon. The police searched Rondon's house after his arrest and found a shopping bag in the attic which contained an identification bracelet and dog tags bearing Alarcon's name, along with $8,000.00 and a key to Alarcon's lock box.

## DISCUSSION

### I. Statutory Mental Retardation Exemption From The Death Penalty Does Not Apply

Rondon first challenges the propriety of his death sentence. He argues that the statutory exemption which precludes mentally retarded individuals from receiving the death penalty must be applied retroactively to comport with his federal and state constitutional rights. Rondon next argues that he is a mentally retarded individual within the meaning of the statute and is therefore ineligible to receive a death sentence. We find that Rondon is not a mentally retarded individual within the meaning of the statute, and even if we found otherwise, we do not find that his death sentence violated his constitutional rights.

#### A. Retroactive Application of Mental Retardation Exemption

■ As a threshold issue, Rondon argues that Indiana Code sections 35–50–2–9 and 35–36–9–6 (1998),[5] exempting mentally retarded individuals from the death penalty, should apply to him retroactively in order to comport with his constitutional rights including equal protection, protection from cruel and unusual punishment, and due process. We previously addressed whether Indiana Code sections 35–50–2–9 and 35–36–9–1 to –7 (1998) should be applied retroactively in Allen v. State, 686 N.E.2d 760 (Ind.1997). In Allen, we stated that "[a]bsent a constitutional mandate for the rule exempting mentally

retarded individuals, this Court is neither expected nor required to engage in retroactivity analysis. Rather, the extent of our writ is to enforce the law as it was at the time [he] committed his crimes." Id. at 786. The language of the public law amending the statute underscores this point. As we observed in Allen, "the General Assembly specifically legislated and the Governor signed into law a statute of repose for claims of mental retardation in capital cases tried before July 1, 1994, rather than amending the Constitution or leaving the act open-ended for judicial interpretation." Id. (citing Pub.L. 158–1994, § 8, 1994 Ind. Acts 1857). Thus, even if the post-conviction court found Rondon to be mentally retarded, which it did not, the statute simply does not apply to him. Nonetheless, Rondon asserts that he is mentally retarded and if the statute is not applied retroactively, the Equal Protection, Due Process, and Cruel and Unusual Punishment Clauses of the United States and Indiana Constitutions will be violated. We will briefly address each issue in turn.

#### i. Equal Privileges and Immunities Clause

■ Rondon argues that the statutory exemption for mentally retarded individuals must apply retroactively to comport with the Equal Privileges and Immunities Clause. The Indiana Constitution provides that the "General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms, shall not equally belong to all citizens." IND. CONST. art. I, § 23. Since Rondon did not develop a cogent Fourteenth Amendment argument as required by Indiana Appellate Rule 8.3(A)(7), we will discuss only his equal privileges and immunities claim under the Indiana Constitution.

■ Rondon argues that in amending the death penalty statute, the legislature created two classes of mentally retarded individuals: those who were convicted before the July 1, 1994, effective date, and those who

---

5. Indiana Code section 35–50–2–9 (1998), which governs death sentences, provides that "the state may not proceed against a defendant under this section if a court determines at a pretrial hearing

under IND. CODE § 35–36–9 that the defendant is a mentally retarded individual." Indiana Code section 35–36–9–2 (1998) defines "mentally retarded individual."

were convicted after that date. Rondon claims that the date draws an arbitrary and discriminatory distinction between two similarly situated classes in violation of the equal privileges and immunities clause. When analyzing an equal privileges claim under Article 1, Section 23, this Court applies a two step analysis as established in *Collins v. Day*, 644 N.E.2d 72, 80 (Ind.1994).

> First, the disparate treatment accorded by the legislation must be reasonably related to inherent characteristics which distinguish the unequally treated classes. Second, the preferential treatment must be uniformly applicable and equally available to all persons similarly situated.

*Id.* In other words, Rondon argues that the statute distinguishing between mentally retarded individuals convicted prior to and after July 1, 1994, must be reasonably related to inherent characteristics which distinguish the two groups of mentally retarded defendants. However, we do not agree with Rondon's characterization of the distinguished classes. The unequally treated classes here are mentally retarded and non-mentally retarded defendants convicted after July 1, 1994. Thus, the issue is whether the statutory exemption of mentally retarded defendants from the death penalty is reasonably related to inherent characteristics which distinguish mentally retarded and non-mentally retarded defendants. The General Assembly enacted this legislation to exempt from the death penalty mentally retarded defendants whose "cognitive, volitional, and moral capacity to act with the degree of culpability associated with the death penalty" is now questioned. *Penry v. Lynaugh*, 492 U.S. 302, 338, 109 S.Ct. 2934, 2957, 106 L.Ed.2d 256, 291 (1989). The exemption for mentally retarded defendants is reasonably related to their inability to act with the requisite culpability sufficient to warrant the death penalty and reasonably justifies the distinction between mentally retarded and non-mentally retarded defendants. We find that Rondon's

claim with respect to the first prong of the test in *Collins* must fail.

██ Even if Rondon prevailed under the first prong of the *Collins* test, we nonetheless find that Rondon's claim that he is similarly situated to those mentally retarded defendants convicted after July 1, 1994, fails under the second prong. Amendments to a law that are coupled with a savings clause[6] do not create two similarly situated groups of people. *Rivera v. State*, 179 Ind.App. 295, 385 N.E.2d 455, 457 (1979). "Criminal statutes apply exclusively to one class of people, those who violate the law, and they relate to the specific point in time that a violation occurs. Upon alteration of the criminal law, individuals subsequently convicted are not similarly situated and cannot be equated to those previously convicted."[7] *Id.* at 457. Also, as we noted in *State v. Alcorn*, "the time of a crime is selected as an act of free will by the offender." 638 N.E.2d 1242, 1245 (Ind.1994). The criminal, not the State, chooses which statute applies. Rondon is bound by the laws in effect at the time he committed the crime. In 1984, the time of this crime, mentally retarded individuals were included within the group of persons eligible to receive the death penalty. We find that Rondon is not similarly situated to mentally retarded defendants convicted after July 1, 1994, and therefore, he has no viable equal privileges and immunities claim.

### ii. *Cruel and Unusual Punishment*

██ Rondon also argues that sentencing mentally retarded individuals to death under the prior statute is now constitutionally prohibited by the Eighth Amendment of the Federal Constitution and Article 1, Section 16 of the Indiana Constitution in light of the legislative amendments exempting mentally retarded individuals from the death penalty. We have already determined in *Allen v. State* that Article 1, Section 16 of the Indiana Constitution is not violated under the circumstances, and we decline to revisit the issue

---

6. *See supra* Discussion section A.

7. This Court has found in prior cases that a change in penal statutes which applies only to those who commit their crimes after its effective

date does not violate one's equal protection rights. *See State v. Alcorn*, 638 N.E.2d 1242, 1245 (Ind.1994); *Vicory v. State*, 272 Ind. 683, 400 N.E.2d 1380, 1381–83 (1980).

today.[8] 686 N.E.2d 760, 786 (Ind.1997). Similarly, the United States Supreme Court has examined this issue and held that the Eighth Amendment is not violated per se by the execution of a mentally retarded individual. *Penry v. Lynaugh,* 492 U.S. 302, 340, 109 S.Ct. 2934, 2958, 106 L.Ed.2d 256, 292 (1989). However, the Court seemed to leave room for reconsideration if "objective evidence of contemporary standards of decency" demonstrated a national consensus that sentencing mentally retarded persons to death inflicts cruel and unusual punishment. *Id.* at 334, 109 S.Ct. 2934. The Court observed that the Eighth Amendment recognizes "evolving standards of decency that mark the progress of a maturing society." *Id.* at 330–31, 109 S.Ct. 2934 (quoting *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630, 642 (1958)). These evolving standards are best measured through the objective statements of state legislation. *Id.* At the time *Penry* was decided, only two states had laws either in force or enacted, but not yet effective, which banned execution of the mentally retarded. *Id.* at 334, 109 S.Ct. 2934. The Court concluded that, based on this objective evidence, a national consensus that sentencing mentally retarded defendants to death inflicts cruel and unusual punishment did not exist. *Id.*

Rondon suggests that there now exists a consensus amongst the states that sentencing mentally retarded defendants to death inflicts cruel and unusual punishment. Of the thirty-eight states employing the death penalty, Rondon cites to eleven states which prohibit the execution of the mentally retarded.[9] He also cites to the twelve states which do not employ any form of capital punishment to support his claim.[10] Further, Rondon offers that of the 76% of Indiana residents who favor the death penalty, 74% do not favor its application to the mentally retarded.[11] While this may reflect an increasing trend against execution of the mentally retarded, we are strained to find national consensus from these statistics.

■ To illustrate the extent of objective evidence needed to prove national consensus, the Court in *Penry* contrasted the number of states which prohibited the execution of the insane in *Ford v. Wainwright,* 477 U.S. 399, 408 & n. 2, 106 S.Ct. 2595, 2601 & n. 2, 91 L.Ed.2d 335, 346 & n. 2 (1986), to the number of states which prohibited the execution of the mentally retarded. *Id.* Referring to *Ford,* the Court identified that "[n]o State permitted the execution of the insane, and 26 States had statutes explicitly requiring suspension of the execution of a capital defendant who became insane. Other States had adopted the common law prohibition against executing the insane." *Id.* The Court further illustrated "objective evidence of contemporary standards of decency" in describing that "18 States expressly established a minimum age in their death penalty statutes, and all of them required that the defendant have attained at least the age of 16 at the time of

8. In *Allen,* we stated that:

> [t]he idea that the legislature decided to exempt mentally retarded criminals from the death penalty as a statement of society's regard for the moral culpability of such individuals is legitimate. However, the General Assembly specifically legislated and the Governor signed into law a statute of repose for claims of mental retardation in capital cases tried before July 1, 1994, rather than amending the Constitution or leaving the act open-ended for judicial interpretation.

686 N.E.2d 760, 786 (Ind.1997) (citing Pub.L. 158–1994, § 8, 1994 Ind. Acts 1857). We concluded that Allen was not subjected to cruel and unusual punishment when the statute exempting mentally retarded defendants was not applied retroactively. *Id.*

9. ARK. STAT. ANN. § 5–4–618(b) (Michie 1997); COLO. REV. STAT. ANN. § 16–9–403 (West 1998); GA. CODE ANN. § 17–7–131(j) (1997); IND. CODE § 35–36–9–6 (1998); KAN. STAT. ANN. § 21–4623(d) (1995); KY. REV STAT. ANN. § 532.140(1) (Michie 1990); MD. CODE ANN., Crimes and Punishments, art. 27 § 412(g)(1) (1996 & Supp. 1998); N.M. STAT. ANN. § 31–20A–2.1(B) (Michie 1994); N.Y. CRIM. PROC. LAW § 400.27(12)(c) (Supp.1998); TENN. CODE ANN. § 39–13–203(b) (1997); WASH. REV.CODE § 10.95.030(2) (Supp. 1998).

10. Alaska, Hawaii, Iowa, Maine, Massachusetts, Michigan, Minnesota, North Dakota, Rhode Island, Vermont, West Virginia, and Wisconsin.

11. Edmund F. McGarrell & Marla Sandys, *Indiana Citizens and Lawmakers on the Death Penalty: Results of the 1992–1993 Public and Legislative Surveys* (July 1993).

the offense." *Id.* (citing *Thompson v. Oklahoma*, 487 U.S. 815, 829 & n. 30, 108 S.Ct. 2687, 2695–96 & n. 30, 101 L.Ed.2d 702, 714–15 & n. 30 (1988)). In comparison, evidence that eleven states ban execution of the mentally retarded falls short of the objective evidence necessary to show national consensus as suggested in *Penry*. Moreover, evidence that of the 76% of Indiana residents who favor capital punishment, 74% disfavor executing mentally retarded individuals does not bolster Rondon's position. This statistic is specific to Indiana, which alone, surely cannot be viewed as the national position. The Court in *Penry* reviewed similar statistics and concluded that:

> [t]he public sentiment expressed in these and other polls and resolutions may ultimately find expression in legislation, which is an objective indicator of contemporary values upon which we can rely. But at present, there is insufficient evidence of a national consensus against executing mentally retarded people convicted of capital offenses for us to conclude that it is categorically prohibited by the Eighth Amendment.

*Id.* at 335, 109 S.Ct. 2934. We do not find today sufficient objective evidence of contemporary standards of decency which demonstrates that a categorical exemption of the mentally retarded from the death penalty is mandated by the Eighth Amendment.

### iii. *Due Process Clauses*

■ Rondon maintains that he was denied due process under the Fourteenth Amendment of the Federal Constitution and Article 1, Section 12 of the Indiana Constitution. Although Rondon does not clearly develop his due process claim, it appears that he alleges a violation of substantive due process under the Federal Constitution.[12] In support of his claim, however, Rondon cites to several procedural due process cases[13] and only two substantive due process cases. Moreover, in both substantive due process cases, the Court rejected the substantive due process claims. In the first case, the Court did not find a violation of substantive due process when considering whether pretrial detention under the Bail Reform Act of 1984 constitutes an impermissible punishment. *United States v. Salerno*, 481 U.S. 739, 755, 107 S.Ct. 2095, 2105–06, 95 L.Ed.2d 697, 714 (1987). In the second case, the Court declined to find a substantive due process violation when it considered whether a juvenile alien has a fundamental right to be released from custody, but not into the custody of any adult or institution, pending the deportation hearing. *Reno v. Flores*, 507 U.S. 292, 299–300, 113 S.Ct. 1439, 1446, 123 L.Ed.2d 1, 15 (1993). These cases do not further Rondon's rather vague substantive due process argument and we find no support for this claim.

### B. *Rondon Is Not Mentally Retarded Within the Meaning of the Statute*

■ Even if we were to find that the death penalty exemption for mentally retarded defendants applies retroactively, the post-conviction court found that Rondon was not mentally retarded within the meaning of Indiana Code section 35–36–9–2 (1998). Under Indiana Code section 35–36–9–2 (1998), "'mentally retarded individual' means an individual who, before becoming twenty-two (22) years of age, manifests: (1)[s]ignificantly subaverage intellectual functioning; and (2)[s]ubstantial impairment of adaptive functioning; that is documented in a court ordered evaluative report." Rondon asserts that he is mentally retarded according to

---

12. "No State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

13. *Jones v. United States*, 463 U.S. 354, 370, 103 S.Ct. 3043, 3052–53, 77 L.Ed.2d 694, 709 (1983) (holding "that when a criminal defendant establishes by a preponderance of the evidence that he is not guilty of the crime by reason of insanity, the Constitution permits the Government, on the basis of the insanity judgment, to confine him to a mental institution until such time as he has regained his sanity or is no longer a danger to himself or society."); *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 209–10, 96 L.Ed. 183, 190 (1952) (concluding that the forcible extraction of morphine capsules to secure conviction violated procedural due process); *Villanova v. Abrams*, 972 F.2d 792, 798 (7th Cir.1992) (finding no procedural due process violation when two mental health professionals certify need for twenty-four hour civil commitment).

Indiana Code section 35–36–9–2 (1998) and that the post-conviction court reached its decision that Rondon was not mentally retarded based upon incomplete information. Rondon maintains that if the post-conviction court had properly admitted and considered certain scientific and lay evidence, the post-conviction court necessarily would have concluded that Rondon was mentally retarded. Upon review, a trial court's decision to admit scientific evidence as reliable under Indiana Evidence Rule 702(b) is subject to an abuse of discretion standard. *Ingram v. State,* 699 N.E.2d 261, 262 (Ind.1998); *McGrew v. State,* 682 N.E.2d 1289, 1292 (Ind.1997); *Jervis v. State,* 679 N.E.2d 875, 881 (Ind.1997).

In a classic "battle of the experts," Rondon and the State presented expert witnesses to testify as to Rondon's intellectual and adaptive functioning. Rondon contends that the State's expert witness relies upon an out-moded, unreliable test and that the results produced by it in comparison to the results of the test his experts relied upon are questionable. The test at issue, the Escala de Inteligencia Wechsler para Adultos (EIWA), is a Spanish I.Q. test developed in the 1950s. Rondon offers much evidence in support of his contention that the revised Wechsler Adult Intelligence Scale for Adults (WAIS–R), upon which his experts relied, is a much better indicator of Rondon's mental condition. However, Rondon did not challenge the admissibility of the EIWA test as being so unreliable that it should have been excluded under Indiana Evidence Rule 702(b). Rondon also did not object to the State expert's testimony regarding the EIWA test. The post-conviction court heard the evidence and chose to believe the testimony of the State's expert rather than the testimony of Rondon's experts, and found that Rondon is not mentally retarded. The post-conviction court did not abuse its discretion.

Rondon also claims that the post-conviction court erred in refusing to hear relevant, non-cumulative testimony from his lay and expert witnesses regarding the adaptive behavior aspect of his mental retardation claim. Rondon offered and the post-conviction court rejected evidence from two experts and six lay witnesses on the issues of intellectual functioning and adaptive behavior. The post-conviction court found that the probative value of the proffered testimony was substantially outweighed by the time-consuming presentation of cumulative evidence. Ind. Evidence Rule 403. We will review the post-conviction court's decision to exclude the proffered evidence applying an abuse of discretion standard of review. Ind. Post–Conviction Rule 1(5); Evid. R. 403; *see Harrison v. State,* 699 N.E.2d 645, 648 (Ind. 1998).

Although Rondon's witnesses, Drs. Choca and Vargas, testified as to his intellectual and adaptive functioning, Rondon sought to present additional expert testimony from Drs. Dever and Gelbort. Dr. Dever, generally, would have provided additional testimony about adaptive functioning. Dr. Gelbort would have attempted to refute the State expert witness's conclusion about Rondon's mental retardation. The post-conviction court concluded that Drs. Dever's and Gelbort's testimony would be cumulative and excluded their evidence applying Indiana Rule of Evidence 403. We do not find an abuse of discretion here.

The lay witness testimony specifically addressing Rondon's adaptive functioning, however, would not have been cumulative evidence. Since adaptive functioning can be determined by the subject's everyday activities, lay testimony may be very useful in determining various elements of adaptive functioning ability.[14] Moreover, it is the re-

---

14. Although Indiana Code section 35–36–9–2 (1998) defines a mentally retarded individual as one who "manifests[ ] (1) significant subaverage intellectual functioning; and (2) substantial impairment of adaptive behavior[,]" it does not further define "adaptive behavior." At the post-conviction hearing, Dr. Choca testified that the *Diagnostic and Statistical Manual* of the American Psychiatric Association is the professionally recognized manual that establishes criteria for mental impairments. The *Diagnostic and Statistical Manual* is now in its fourth edition and is referred to as the DSM–IV. American Psychiatric Assn., Diagnostic and Statistical Manual—IV (1994). The DSM–IV defines impairment of adaptive functioning as the existence of limitations in at least two of ten areas of skill: "communication, self-care, home living, social/interpersonal skills,

sponsibility of the post-conviction court to make a factual finding on the existence or nonexistence of mental retardation. *See Rogers v. State*, 698 N.E.2d 1172, 1180 (Ind. 1998) (noting that the trial court must make a factual finding of mental retardation). The testimony of the lay witnesses should have been admitted in order for the post-conviction court to make a fully-informed determination.[15] The post-conviction court abused its discretion by refusing to admit this testimony.[16]

 Nonetheless, *in order to constitute reversible error, Rondon must show that a substantial right is affected by the exclusion of this evidence.* Ind. Evidence R. 103(a)(2); *see Ogle v. State*, 698 N.E.2d 1146, 1151 (Ind.1998). We have determined that the statute exempting the mentally retarded from receiving the death penalty does not apply retroactively, and thus, Rondon has not suffered from the trial court's error.

## II. *Ineffective Assistance of Counsel Claims*

Rondon insists that he received ineffective assistance of counsel. First, Rondon argues that his trial counsel committed numerous errors that amount to ineffective assistance of counsel. Second, Rondon argues that his appellate counsel's failure to raise an ineffective assistance of trial counsel claim on direct appeal constituted ineffective assistance of appellate counsel. Finally, Rondon argues that defects in the Lake County indigent

defender system create a presumption of ineffective assistance of counsel.

 Turning to the first ineffective assistance of counsel claim, we will apply the rule recently established in *Woods v. State*,[17] that "a Sixth Amendment claim of ineffective assistance of trial counsel may be presented for the first time in a petition for postconviction relief." 701 N.E.2d 1208, 1210 (Ind.1998). However, we cautioned that "if ineffective assistance of trial counsel is raised on direct appeal, it will be foreclosed in postconviction proceedings." *Id.* Since Rondon did not raise ineffective assistance of trial counsel on direct appeal, this issue is available for review on post-conviction appeal. Rondon's claims of ineffective assistance of trial counsel and ineffective assistance of trial counsel based on defects in the Lake County indigent defender system will be addressed below on the merits.

 To prevail on a claim of ineffective assistance of counsel, Rondon must show that his counsel's performance fell below an objective standard of reasonableness as determined by prevailing professional norms, and that the lack of reasonable representation prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984). Rondon must rebut the presumption that trial counsel exercised reasonable judgment and rendered adequate assistance with strong and convincing evidence to the contrary. *Autrey v. State*, 700 N.E.2d 1140, 1141 (Ind.1998).

use of community resources, self-direction, functional academic skills, work, leisure, health and safety." *Id.* at 39. We do not adopt the DSM–IV's definition of adaptive functioning as the definition of adaptive behavior. However, the DSM–IV may provide some guidance as to the type of information useful to the determination of substantial impairment of adaptive behavior under the statute. Since lay testimony most likely would provide this information and would then assist the trier of fact in making its determination of impairment of adaptive behavior, lay testimony is relevant and admissible under Indiana Evidence Rule 401.

15. Defendant offered lay testimony regarding his inability to count change, his poor sense of direction, his inability to travel more than a short distance on the bus system, and his illiteracy.

16. Throughout his brief, defendant expresses disapproval with the way in which his post-conviction hearing was held. While we find no reversible error, we are disappointed with some of the comments made by Magistrate Page. For example, when defendant tried to put one of his expert's experience into evidence, Magistrate Page refused to hear it, stating that he was familiar with that expert already and that "the purpose of this record is not to make a record for another court but for me to make a decision." (PCR. at 2508.) This statement reflects a lack of understanding of the importance of the trier of fact in the judicial process, a process which includes the possibility of appeal. By not hearing and weighing relevant, admissible evidence, the trier of fact ignores the realities of appellate review.

17. This case was pending at the time we announced the rule in *Woods*.

Even if Rondon establishes that his trial counsel's performance fell below the objective standard of reasonableness, he still must show prejudice resulting therefrom. The concept of prejudice, as established in *Strickland,* has been further defined as whether "counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell,* 506 U.S. 364, 372, 113 S.Ct. 838, 844, 122 L.Ed.2d 180, 191 (1993).

In this case, the post-conviction court found that Rondon received effective assistance of appellate counsel, and therefore, any claim of ineffective assistance of trial counsel had been waived. We decline to review this waiver determination, however, because we consider Rondon's claim of ineffective assistance of trial counsel pursuant to *Woods.* As we explain in the following subsections, Rondon has established that he received ineffective assistance of trial counsel at the penalty phase.

### A. *Rondon Did Not Receive Effective Assistance of Trial Counsel*

Rondon's first ineffective assistance of counsel claim challenges the adequacy of his representation at trial. His claim can be separated into two distinct parts, ineffective assistance of trial counsel at the guilt phase and ineffective assistance of trial counsel at the penalty phase. Regarding the guilt phase, Rondon recites several errors made by his trial attorneys and argues that the culmination of these errors constitutes ineffective assistance of trial counsel.

#### i. *The Guilt Phase*

Rondon first alleges that his trial attorneys, Clark and Holcomb, provided ineffective assistance of counsel by arbitrarily deciding to put the State to its burden and presenting no defense without first conducting an investigation of the State's case. Rondon asserts that his trial attorneys were ineffective because prior to trial they did not review the prosecutor's file and exhibits, and did not interview any of the State's witnesses before deciding to put the State to its burden. Failing to investigate the strength of the State's case before deciding to put the State to its burden, he claims, not only falls below prevailing standards of effective representation, but also undermines the reliability of the trial's outcome. We do not find that Rondon's trial counsel arbitrarily decided to put the State to its burden without first investigating the strength of the State's case.

■ In this case, trial counsel's decision to put the State to its burden without conducting an investigation to discover information beyond what the State had supplied through discovery was reasonable under the circumstances. On its own motion, the trial court entered a mutual reciprocal discovery order. Pursuant to such order, the State supplied Rondon's counsel with witnesses' statements, police reports, inventory reports, photographs, lab reports, arrest reports, and the autopsy report. Nonetheless, Rondon argues that his trial counsel should have reviewed the prosecutor's file and exhibits and interviewed the State's witnesses prior to trial, and the failure to do so constitutes ineffective assistance. However, this Court has found in prior cases that trial counsel's failure to take depositions or interview witnesses, in itself, does not constitute ineffective assistance of counsel. *Brown v. State,* 691 N.E.2d 438, 446–47 (Ind.1998); *Johnson v. State,* 675 N.E.2d 678, 686 (Ind.1996); *Spranger v. State,* 650 N.E.2d 1117, 1122 (Ind.1995). In light of the information provided by the prosecutor, Rondon has not identified what additional information would have been discovered and he has not demonstrated how he was prejudiced by trial counsel's failure to further investigate the strength of the State's case. Rondon's claim of ineffective assistance of trial counsel based on counsel's alleged failure to further investigate the weight of the State's case is without merit. At first blush, it would seem that a trial strategy consisting of nothing more than putting the State to its burden is an improbable approach to a defense, especially in a capital case. However, this is precisely the type of decision that falls within the broad definition of trial strategy.[18]

---

18. *See Wisehart v. State,* 693 N.E.2d 23, 42 (Ind. 1998) (stating "that the decision not to make an opening statement is a matter of trial strategy and will not support an ineffective assistance of counsel claim."); *Brown v. State,* 691 N.E.2d 438, 447 (Ind.1998) (identifying that "[a] deci-

 Rondon's second ineffective assistance of trial counsel claim stems from trial counsel's decision not to investigate Rondon's version of the events. Rondon told his attorneys that three men, Maroto, Robles, and codefendant Martinez, allegedly threatened his daughter's safety if Rondon did not assist them in perpetrating the crime. Attorney Clark dismissed Rondon's version of· the events, stating in his affidavit that "[w]hat Rondon was saying happened that night did not make sense to me, and I did not investigate it." (PCR. at 4670.) Holcomb confirmed their decision in his affidavit, stating "[a]lthough we were aware that Mr. Rondon had reported that three men from Chicago had committed this offense, and that he had provided the police with their names and description, [Clark] and I did not investigate this defense." (PCR. at 4709.) These admissions, however, are not dispositive. In *Faust v. State*, we stated that "[a] defense attorney cannot be required to pursue a theory of defense that appears to him to be fruitless and which in fact might prove to be counterproductive as far as his presentation to the jury was concerned." 642 N.E.2d 1371, 1373 (Ind.1994). In this case, the State provided Rondon's counsel with statements made by co-defendant Martinez and Gabriel Maroto, or "El Primo." In his statement to police, Maroto adamantly denied that he had ever entered the State of Indiana, declaring that he went home to his wife after working at his Chicago restaurant until 10:00 p.m. the night of the crime. He also vehemently claimed that he had never met Rondon. Maroto's wife, Isabel, offered the same explanation to police. Co-defendant Martinez similarly told police that Rondon's version of the events was not true. Even though the State's discovery list includes no statement by or report of the third alleged participant, Ramon Robles, Rondon's counsel received Everette Amiotte's statement, placing Rondon at the scene of the crime, and Eva Copeland's statement, establishing Rondon's forethought in killing Alarcon. Thus, the

State's evidence produced through discovery provided trial counsel with an additional basis to regard Rondon's account of the events with the reasonable skepticism they held. Under the circumstances, we will not second-guess trial counsel's strategic decision not to investigate Rondon's version of the events.

 Rondon's third ineffective assistance of counsel claim is based on trial counsel's admissions that they did not investigate the possibility of presenting an intoxication defense. In his affidavit, Clark stated that he "had no recollection of investigating Mr. Rondon's use of alcohol and/or drugs to determine the possibility of an intoxication defense." (PCR. at 4670.) Holcomb reiterated this statement verbatim in his affidavit. Nonetheless, we do not find trial counsel's failure to investigate and present an intoxication defense prejudicial. In *Gambill v. State*, this Court found that the defense of voluntary intoxication requires a showing that "the intoxication was so severe as to prevent [the defendant] from forming the state of mind necessary to commit [the crime]." 675 N.E.2d 668, 673 (Ind.1996) (citations omitted). After reviewing the record, we find that Rondon has not produced any evidence which demonstrates, first, that he was intoxicated on the night in question and, second, that his alleged intoxication was so severe as to prevent him from forming the requisite intent to rob and murder. Moreover, Eva Copeland's testimony illustrates that Rondon previously thought of robbing and killing Alarcon. Rondon's trial counsel's failure to investigate the possibility of an intoxication defense does not constitute ineffective assistance of counsel because he has not shown prejudice under the circumstances.

 Finally, Rondon argues that he was denied effective assistance of trial counsel because his trial counsel, after deciding to put the State to its burden, failed to truly challenge the State's case. Rondon claims

sion regarding what witnesses to call is a matter of trial strategy which an appellate court will not second-guess ..."); *State v. Moore,* 678 N.E.2d 1258, 1262 (Ind.1997) (stating that "[t]he decision to seek a change of venue is generally a matter of trial strategy that we will not second-

guess on collateral attack."); *Thompson v. State,* 671 N.E.2d 1165, 1169 (Ind.1996) (stating that "a decision by trial counsel concerning whether to file particular motions is a matter of trial strategy ...").

his trial counsel should have elicited testimony that no blood was found on the knives taken from the trunk of Copeland's car; that no blood was found on Rondon's clothes and shoes at the time of his arrest; that no blood or fingerprints were discovered on the evidence seized from Rondon's attic; that no blood was discovered in his fingernail scrapings; that no blood was found in the victim's car; that no cuts, scratches, or bruises were discovered on his body at arrest; and that fingerprints have an indeterminate lifespan. Rondon correctly points out that crime lab reports indicated the absence of blood or fingerprints on the aforementioned items of evidence.

■ Trial counsel's strategy to put the State to its burden and not present a defense, like other strategic decisions,[19] is a legitimate trial strategy. In pursuing this defense, Rondon's attorneys were limited to the witnesses and testimony advanced on direct and redirect examination. *See generally, Lambert v. State*, 448 N.E.2d 288, 292 (Ind.1983) ("A matter is the proper subject of cross-examination if it tends to elucidate, modify, explain, contradict, or rebut the testimony given on direct examination.") (citation omitted); *Ballard v. State*, 262 Ind. 482, 318 N.E.2d 798, 806 (1974) ("A long line of Indiana authority supports a cross-examiner's right to explore any and all phases of a general subject that has been opened up by a witness on direct examination.") (citations omitted). In this case, the only State witness who was competent to testify about the presence or absence of blood was Patricia Vidal. Vidal performed the blood test comparisons for all evidence submitted by the State. On direct examination, the State admitted evidence of two "unknown" blood lifts, which were consistent with Alarcon's blood; evidence of two additional "unknown" blood lifts and money with dried human blood, which were consistent with blood from Alarcon, Rondon, Martinez, or Amiotte; and evidence of a swab and saline containing an unknown red substance, which produced an insufficient blood concentration to type. On cross-examination, Rondon's counsel simply reiterated that the exhibits that produced a

blood type consistent with Alarcon, Rondon, Martinez, and Amiotte were inconclusive. Rondon's counsel could not have elicited testimony regarding the other items because such testimony would have extended beyond the scope of direct examination. To elicit this information Rondon's counsel would have had to call witnesses which was contrary to their stated strategy to put the State to its burden. Similarly, trial counsel could not elicit information that no latent fingerprints were found on the evidence seized from Rondon's attic because it would have been beyond the scope of the State's direct examination. Finally, trial counsel's failure to discover that latent fingerprints have an indeterminate life span and to extract this information on cross-examination is, at best, an isolated mistake. Even though trial counsel's strategy to put the State to its burden and not present a defense proved unsuccessful, we do not find that defense counsel's failure to elicit testimony regarding the absence of blood or fingerprints on certain pieces of evidence prejudiced Rondon to such an extent as to constitute ineffective assistance of trial counsel at the guilt phase.

### ii. *The Penalty Phase*

Rondon claims that he was denied effective assistance of trial counsel at the penalty phase. He argues that trial counsel's failure to present mitigating evidence of his background, childhood, and mental health was not a strategic decision, but the result of a complete failure to conduct an investigation of his history prior to 1982. He claims that his counsel arbitrarily and unreasonably decided to limit their investigative efforts to the two or three years prior to his arrest, and that this decision prevented the jury from learning of significant mitigating circumstances.

■ The United States Supreme Court has recognized the important role mitigating evidence plays in a capital case. Presentation of mitigating evidence to the jury allows the jury to "make an individualized assessment of the appropriateness of the death penalty." *Penry v. Lynaugh*, 492 U.S. 302,

---

19. *See supra* n. 18.

319, 109 S.Ct. 2934, 2947, 106 L.Ed.2d 256, 278–79 (1989).

> [E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.... [T]he sentence imposed at the penalty stage should reflect a reasoned *moral* response to the defendant's background, character, and crime.

*Id.* (quoting *California v. Brown,* 479 U.S. 538, 545, 107 S.Ct. 837, 841, 93 L.Ed.2d 934, 942 (1987) (O'Connor, J., concurring)). This Court frequently faces claims in post-conviction proceedings that a defendant in a capital case was denied his or her constitutional right to the effective assistance of counsel at the penalty phase. Such claims usually focus on the failure of counsel to investigate or present evidence of mitigating circumstances. In a small number of such cases, we have found grounds for granting post-conviction relief.

In *Averhart v. State,* 614 N.E.2d 924, 930 (Ind.1993), counsel presented absolutely no evidence of mitigating circumstances to the jury. The penalty phase strategy was to call Averhart and his mother as witnesses and invite them to make whatever statements they wished. Counsel testified at the post-conviction hearing that he had not made any other investigation. We found that the significant mitigating evidence presented at the post-conviction hearing was sufficient to undermine confidence in Averhart's death sentence. *Id.* at 931.

In *Burris v. State,* 558 N.E.2d 1067, 1074 (Ind.1990), we found fault with counsel's maligning comments about Burris at the summation of the guilt phase and inconsistent presentation of mitigating evidence of intoxication. Counsel had not presented any other mitigating evidence and the record established that counsel had not investigated mitigation. We found that the evidence presented at the post-conviction hearing indicated that substantial evidence of mitigating circumstances was available and might have had an effect on the jury. *Id.* at 1076.[20]

In *Smith v. State,* 547 N.E.2d 817, 821 (Ind.1989), counsel introduced no evidence of mitigating circumstances and, in fact, did not prepare at all for the penalty phase. He testified at the post-conviction hearing that he had conducted no investigation of possible mitigating circumstances because he had assumed Smith would be acquitted. We cited evidence of mitigating circumstances presented at the post-conviction hearing as undermining our confidence in Smith's death sentence. *Id.* at 822.

In these cases, this Court's confidence in the death sentences was undermined when significant mitigating evidence was presented at the post-conviction hearing which substantiated the claim that trial counsel failed to investigate and present mitigating evidence at the penalty phase of trial. Generally, counsel is permitted to limit his or her investigation of a capital defendant's background "to the extent that reasonable professional judgments support the limitations on investigation." *Burger v. Kemp,* 483 U.S. 776, 795, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987) (quoting *Strickland v. Washington,* 466 U.S. 668, 690–91, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)); *see also Canaan v. State,* 683 N.E.2d 227, 234 (Ind.1997); *Townsend v. State,* 533 N.E.2d 1215, 1233 (Ind. 1989). But as in *Averhart, Burris,* and *Smith,* here we find no reasonable professional judgment that justifies Rondon's counsel's decision to limit the investigation to the two or three years prior to his arrest.

Attorneys Clark and Holcomb simply failed to adequately investigate Rondon's background in search of mitigating information which could have been used at the penalty phase of trial. In his affidavit, Clark admitted that he "had hoped that at least one

---

**20.** We said:

> [a] jury and a judge hearing the recently developed mitigating evidence could perhaps properly conclude that death was the appropriate penalty. The cumulative effect of these acts and omissions, however, is sufficiently serious to lead us to view a decision made under these circumstances as unreliable, warranting reversal of appellant's death sentence.

*Burris,* 558 N.E.2d at 1076.

juror would be convinced that the State had not proven its case." (PCR. at 4672.) Clark also claimed to have spent so much time preparing for the guilt phase of trial, that he and Holcomb neglected penalty phase preparations until the night before the penalty phase of trial. Clark also stated in his affidavit that "[p]rior to trial, [he did] not recall interviewing or contacting anyone who knew Mr. Rondon other than Rev[erand] Cardenas." (PCR. at 4670.) Further, Clark and Holcomb arbitrarily agreed to limit their investigation of Rondon's background to the two years Rondon had lived in Lake County prior to his arrest. Had Rondon's attorneys asked Rondon to summarize his experiences prior to 1982, they likely would have elicited information that Rondon has a second grade education, that he had received psychiatric treatment in Cuba where he was born and raised, that he may have received electric shock as part of the psychiatric treatment, and that he may be suffering from organic brain damage as a result of a blow to the head by a machete, to name a few. Much of this information was discovered by two psychiatrists who interviewed Rondon during a competency evaluation initiated after the jury had recommended death but prior to the court imposing sentence. Counsel had the opportunity, but made no use of this information at the sentencing hearing. In addition, a more thorough investigation would have exposed other significant information regarding Rondon's physical and mental condition, the circumstances endured as a child, and persons who would have testified in support of Rondon had they been given the chance.

While Rondon's counsel called three witnesses during the penalty phase, absent was any coherent presentation of evidence of, or even argument for the existence of, any mitigating circumstances. The witnesses, Rondon's former employer, a self-proclaimed "priest" and the priest's mother with whom Rondon had lived, testified generally to his good work habits, his friendliness, and his gratitude. But counsel never argued that these traits constituted mitigating circum-

stances that the jury should weigh against the aggravating circumstance advanced by the State. In point of fact, counsel did not identify to the jury a single mitigating circumstance in either his opening statement at the penalty phase (which he waived) or his closing statement.

As the preceding paragraph suggests, the evidence presented at Rondon's post-conviction hearing indicated that substantial mitigation evidence was reasonably available but never presented to the jury or the sentencing court. As was the case in *Averhart, Burris* and *Smith*, we find the death sentence imposed in such a situation unfair and unreliable. We therefore reverse.

### B. *Lake County Public Defender System*

■ Rondon contends that the post-conviction court erred by declining to conduct an evidentiary hearing on the issue of whether systemic defects in the Lake County public defender system of providing counsel for indigents led to the ineffective assistance of counsel. We have previously examined a similar systemic error claim in great detail. *Games v. State*, 684 N.E.2d 466 (Ind.1997). In *Games*, we discussed a narrow exception to the two prong *Strickland* test established in *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). 684 N.E.2d at 479.[21] Rondon claims that:

> the surrounding circumstances are such that, although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial.

*Id.* at 479. (internal quotations omitted). As part of his supporting evidence, Rondon relies upon a study conducted by the Spangenberg group. While this study points out many areas which should be improved upon within the Lake County system, it does not reveal that the system is so unfair that it necessarily amounts to a presumption of inef-

**21.** The Supreme Court in *United States v. Cronic* noted that there may be some situations in which the *Strickland* analysis need not be reached because there is such fundamental error in the

system as to raise a presumption of ineffectiveness of counsel. 466 U.S. 648, 662, 104 S.Ct. 2039, 2048, 80 L.Ed.2d 657, 670 (1984).

fective assistance of counsel. Rondon also does not suggest how the alleged systemic defects amount to ineffective assistance of counsel. As we noted in *Games,* the burden of proof in such a claim is extremely heavy, and the situations in which the presumption would arise are extremely limited. *Id.* at 481. This is not one of those limited situations.

### III. *Rondon Received A Fair Forum In Lake County*

 Rondon next argues in broad generalities that he was denied a "fair forum" for review of his post-conviction petition.[22] This argument primarily consists of an angry indictment of the Lake County judicial system. Rondon makes gross generalizations about the post-conviction relief process in Lake County but does not cite any rule, statute or constitutional provision that he contends was violated. Indeed, the only "fair forum" claim Rondon even attempts to relate to the case at hand is a claim that the post-conviction court indicated that appellate counsel should have asked this Court to hold the direct appeal in abeyance in order to seek post-conviction review. We find no error in that suggestion. In fact, we approved that option as an expedient alternative in *Davis v. State,* 267 Ind. 152, 368 N.E.2d 1149, 1151 (1977). We find no merit to this claim.

### IV. *Cumulation of Alleged Errors Does Not Warrant Relief*

Rondon claims that he should be granted post-conviction relief based on the cumulation of many alleged errors. We addressed some of these challenges on direct appeal, such as the alleged unconstitutional line-up and alleged error resulting from the trial court's refusal to sever the defendants' trials, and we will not revisit them here, except to note that these claimed errors do not constitute reversible error. *Rondon v. State,* 534 N.E.2d 719, 724–25, 727 (Ind.1989). To review these issues now would violate the principle of res judicata. *See generally Brown v. State,* 698 N.E.2d 1132, 1142 (Ind. 1998). Also, Rondon raises the claim of pros-

ecutorial misconduct; a claim which was not preserved at trial or presented on direct appeal. As such, this claim is waived. Ind. Appellate Rule 8.3(A)(7). Finally, Rondon claims that fundamental errors in the penalty phase jury instructions, the trial court's use of a confidential questionnaire at sentencing, the presentation of prejudicial and irrelevant evidence at the sentencing phase, and counsel's failure to present critical evidence relevant to sentencing, require reversal. Since we have determined that Rondon received ineffective assistance of counsel at the penalty phase, these issues are moot.

### CONCLUSION

We hold that Rondon received ineffective assistance of trial counsel at the penalty phase and remand for a new penalty phase and sentencing hearing. In all other respects, we affirm the judgment of the post-conviction court.

SHEPARD, C.J., and DICKSON, SULLIVAN, and BOEHM, JJ., concur.

---

**22.** It is unclear what defendant means by the term "fair forum." He does not cite any authority for the source of this term, and we are thus left to assume that he can only be referring to the county and court in which his post-conviction petition was heard.