RUCKER, Justice,
dissenting.
Because I believe Pruitt has met his burden of demonstrating by a preponderance of the evidence that he is mentally retarded, I would reverse his death sentence and remand this cause with instructions to impose a sentence of a term of years. I therefore respectfully dissent. |
In order to be considered mentally retarded, a person must demonstrate "significantly subaverage intellectual functioning" and "substantial impairment of adaptive behavior." Indiana Code § 85-836-9-2. Importantly, both must have been manifested before the person became twenty-two years of age. Id. Pruitt's date of birth is March 4, 1962. Appellant's App. at 285. Thus, Pruitt must show by a preponderance of the evidence manifestation of significantly subaverage intellectual functioning and substantial impairment of adaptive behavior prior to March 4, 1984.
Significantly Subaverage Intellectual Functioning
Intellectual functioning is commonly measured through standardized Intelli-genee Quotient (IQ) tests. Rogers v. State, 698 N.E.2d 1172, 1178 (Ind.1998). "'Gignificantly subaverage intellectual functioning' generally means an IQ of 70 or below, with a margin of error of five points in either direction." Id. at 1178 (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 89 (4th ed. 1994) ("DSM-IV"). To demonstrate that he *124 manifested significantly subaverage intellectual functioning, Pruitt presented to the trial court results from various IQ tests and achievement tests administered to him prior to March 4, 1984. For example Pruitt was administered two Lorge-Thorn-dike group IQ tests. He scored a verbal IQ of 64 and a non-verbal IQ of 65 on the first test administered in March of 1978 (at eleven years of age), and scored a verbal IQ of 64 and a non-verbal IQ of 68 on the second test administered in December of 1976 (at fourteen years of age). See Br. of Appellant at 25; Tr. at 619.
In March 1975 (at thirteen years of age) Pruitt was administered the Otis-Lennon School Ability Test and scored 81. Br. of Appellant at 25; Tr. at 620. Although at least one expert believed that score was inconsistent with Pruitt's claim that he is mentally retarded, see Tr. at 620 (State's expert, lawyer and practicing psychologist, Dr. George Schmedlen), Dr. Charles Golden, a professor of psychology retained by the defense, testified that the Otis-Lennon score likely overestimates Pruitt's actual IQ by 15 to 25 points because that test is an achievement test gauging a person's learning of school subjects as compared with other students in the same grade. Ir. at 1518, 1546. Because he had been held back two grades in school, Pruitt contends that his achievement test scores, when compared to other persons of the same age, indicate an IQ consistent with the results of the Lorge-Thorndike group IQ tests. Reply Br. of Appellant at 17; see also Tr. at 1555-58.
In April of 1975 Pruitt was administered the Towa Basic Test, an achievement test, which produced results similar to the results of the Otis-Lennon test. Tr. at 620-21, 1556. Dr. Golden testified that the achievement test results would have been nearly identical to the results of the Lorge-Thorndike had Pruitt's scores been adjusted for his age. See Tr. at 1557-58 (If adjusted for age, Pruitt's scores indicate he has an IQ in a range from 68 to 68).
Finally, in December of 1981 at age 19, Pruitt was administered the Revised Beta intelligence test and scored a 98. Tr. at 620. Apparently there is some disagreement regarding the reliability of this test. Originally designed during World War I to screen recruits and later used in some forensic prison settings, see Tr. at 620, 1229, 1537-38, the Revised Beta was characterized by Dr. Brian Hudson, a clinical neuropsychologist retained by the defense, as "not a utilized test within the community, generally speaking." Tr. at 1280. Dr. Golden testified that the Revised Beta is "not an accurate test, it is not well regarded in the field, and is not well accepted in the field as a general test of intelligence." Tr. at 1541. By contrast, Dr. Schmedlen testified he believes the Revised Beta Test is reliable. Tr. at 660. However, he acknowledged on cross-examination that he did not review the test measurements to determine whether the Revised Beta was in fact reliable. Tr. at 672.
Both the State and Pruitt presented to the trial court the results of a number of IQ tests that were administered after Pruitt reached twenty-two years of age. See, e.g., Wechsler Adult Intelligence Scale administered in April of 2002, Tr. at 612-13; Stanford-Binet IQ test administered in February of 2008, Tr. at 622-28; and the Wechsler Adult Intelligence Scale administered in July of 2008, Tr. at 609. Those tests, on which the trial court relied in part to conclude Pruitt was not mentally retarded, suggest that Pruitt may have a higher level of intellectual functioning than indicated by the results of tests administered before he reached age twenty-two. However the relevant time period in this case is from March 4, 1962 to March 3, *125 1984. As Dr. Hudson testified, "IQ is meant to be diagnosed in childhood for a reason. It's not meant to be diagnosed in adulthood and then looked back on his childhood to determine if that diagnosis is accurate." Tr. at 1356.
With the exception of the Revised Beta test, which appears to be unreliable, the results of the remaining four tests administered to Pruitt during his youth-two Lorge-Thorndike IQ tests indicating Pruitt fell in the mentally-retarded IQ range, and two academic achievement tests that if adjusted for Pruitt's age indicated Pruitt fell in the mentally-retarded IQ range-show that Pruitt manifested significant subaverage intellectual functioning prior to reaching age twenty-two. In my view Pruitt has carried his burden of proof on this point by at least a preponderance of the evidence.
Substantial Impairment of Adaptive Behavior
Adaptive behavior refers to how well a person deals with everyday life demands compared to other people with similar educational and social backgrounds. Rogers, 698 N.E.2d at 1178. But like intellectual functioning this behavior must also manifest itself before the person reaches twenty-two years of age. In support of its finding that Pruitt did not manifest "substantial impairment of adaptive behavior," see Ind.Code § 35-36-9-2, the trial court relied primarily upon Pruitt's functioning as a carpenter, his obtaining a commercial driver's license, and his performance of duties of an over-the-road truck driver and filling out applications of employment. Op. at 108-09 (citing Appellant's App. at 575 (Order Denying Finding of Mental Retardation)). However those factors considered by the trial court were manifestations of Pruitt's adaptive behavior after he reached twenty-two years of age.
I agree with the majority that although Indiana does not adopt a particular clinical definition of adaptive functioning, clinical definitions may provide some guidance as to the type of information useful to the determination of impairment of adaptive behavior under our statute. Op. at 108-09 (citing Rondon v. State, 711 N.E.2d 506, 516 n. 14 (Ind.1999); Rogers, 698 N.E.2d at 1178). One such useful clinical definition is found in the DSM-IV, which defines impairment of adaptive functioning as the existence of limitations in at least two of ten areas: "communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety." Rondon, 711 N.E.2d at 516 n. 14.
The record before us demonstrates that before age twenty-two Pruitt exhibited several adaptive functioning limitations. For instance, in terms of communication, Pruitt displayed an inability to follow directions: "When playing baseball, he had to be told which way to run every time.... [Olncee you've learned the bases once, [it's] pretty much the standard. ... If you have to be told constantly, that suggests that you have a deficit in your ability to understand what's being told to you." Tr. at 5538; see also Tr. at 1258 ("[Pruitt] did have an extreme amount of difficulty functionally speaking in expressing his needs."). Pruitt also had difficulty as a child understanding concepts involved in playing basketball and playing the game of Monopoly. Tr. at 5538-39. In terms of social skills, as a child Pruitt's peers would ridicule him and he did not understand he was being ridiculed. Tr. at 5541. Pruitt lacked the social skills to develop meaningful relationships, primarily because his disability in communication made it difficult for him to reciprocate communication. "If a conversation is one-sided, what that would suggest is that [Pruitt's] either not *126 understanding or is ignoring what you are saying. In either case, it's dysfunctional _.." Tr. at 5540. In terms of self-direction, Pruitt as a child never initiated games or social activities; there is no evidence that Pruitt undertook any self-initiated activities such as hobbies or sports during his childhood. Tr. at 5548. In terms of health and safety, Pruitt often engaged in activities dangerous to himself as a child. Two persons recalled that Pruitt "would handle bees, even though he knew he was allergic to the bees. He was aware of the significant allergic effect he would have if he was stung by a bee; nonetheless, he continued to ... pick up bees to listen to them buzz, to hear them, to shake them in his hands." Tr. at 5545-46. Pruitt apparently similarly handled snakes. Id. In terms of functional academics, Pruitt was "retained two years in the first three years of school. He only passed to the 7th grade because he was socially promoted." Tr. at 5546-47. Also, according to Dr. Hudson, although Pruitt did not necessarily exhibit a level of substantial impairment in all areas, he did demonstrate deficits in other functional areas: Pruitt never demonstrated the type of behaviors expected of adults to maintain a domicile before or after twenty-two years of age, and he never worked independent of very stringent supervision because he often could not follow directions or reciprocate communication. Tr. at 5540, 5547-48.
As with the trial court's reliance in part on evidence of Pruitt's subaverage intellectual functioning after March 4, 1984, the trial court also relied on evidence of Pruitt's impairment of adaptive behavior after March 4, 1984. However, if we consider only the evidence of record pertaining to Pruitt's behavior during his youth, then it becomes clear that Pruitt manifested substantial impairment of adaptive behavior prior to reaching age twenty-two. In my view Pruitt has also carried his burden of proof on this point by at least a preponderance of the evidence.
Conclusion
It is clear to me that Pruitt is mentally retarded even under a standard requiring proof by clear and convincing evidence. Under the relaxed standard the Court announces today, the fact of Pruitt's mental retardation is even more apparent. Accordingly a death sentence is constitutionally and statutorily impermissible in this case. This cause should be remanded to the trial court with instructions to impose a sentence of a term of years.[9]

. Indiana Code § 35-36-9-7 requires that a defendant determined to be a mentally retarded individual be sentenced under Indiana Code § 35-50-2-3(a), which provides that a defendant convicted of murder shall be imprisoned for a term of years.