**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jun 28 2012, 8:34 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**CAROLINE B. BRIGGS**
Lafayette, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**GEORGE P. SHERMAN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| STEVEN KAMP, | ) | |
| | ) | |
| Appellant-Petitioner, | ) | |
| | ) | |
| vs. | ) | No.  66A05-1109-PC-485 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Respondent. | ) | |

APPEAL FROM THE PULASKI SUPERIOR COURT
The Honorable Patrick B. Blankenship, Judge
Cause No. 66D01-0505-FC-2

June 28, 2012

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BAKER, Judge**

Appellant-petitioner Steven Kamp appeals the denial of his petition for post-conviction relief, claiming that his defense counsel's illnesses and disabilities amounted to ineffective assistance of counsel. Specifically, Kamp argues that he was entitled to relief because a number of traumatic injuries and medical difficulties that his trial counsel sustained, including severe injuries that he received in a courthouse bombing, resulted in an inability to effectively represent him at trial. Concluding that the post-conviction court properly denied Kamp's request for relief, we affirm.

FACTS[1]

The facts, as reported in Kamp's direct appeal are as follows:

> Tina Cress had two children, H.C., a seven-year-old daughter, and K.C., a ten-year-old son, by her ex-husband, Craig Cress. Kamp and Tina had been involved in a relationship for almost three years, had been living together for almost two years, and had just gotten engaged. On May 10, 2005, Kamp came home from work at around 6:30 p.m. and drank five beers. The children were put to bed around 8:00 p.m., and Kamp and Tina argued about her ex-husband. Around 8:30 or 9:00 p.m., Kamp asked Tina if she was going to bed, and Tina told him she was going to stay up to watch the news. Kamp became upset, went to bed, got back up to get a drink of water, and argued with Tina because she would not go to bed. Tina fell asleep on the couch.
> Later that evening, Kamp entered H.C.'s room, unbuttoned his buttons on his pajama pants, grabbed H.C.'s wrist, and made H.C. touch his penis, which was "[s]quishy and soft. . . ." H.C. tried to pull her arm back, but Kamp was too strong and pulled H.C.'s arm back. Kamp eventually left the room after about ten minutes and went to bed. H.C. went and lay on the couch next to Tina because she was scared that Kamp was going to do it again and do it to Tina.
> Tina woke up in the middle of the night to find H.C. lying on the couch with her. In the morning, Tina woke her children and got them breakfast as usual. H.C. ate her breakfast, went into the bathroom, and

---

[1] We heard oral argument in this case in Indianapolis on May 22, 2012. We commend counsel for their able written and oral presentations.

asked Tina to come into the bathroom because she wanted to tell her something. H.C. told Tina that Kamp had gone into her room, grabbed her wrist, and made her touch his "[p]ee-pee." Id. at 189. H.C. also told Tina that she tried to pull away but Kamp was too strong and would not let go of her. Tina took H.C. into the garage and asked H.C. to explain what had happened, and H.C. told Tina the same story again. H.C. would not go back into the house to get dressed for school because she was scared, so Tina brought H.C.'s clothes to the garage.

Tina woke up Kamp and told him that he needed to get out of the house. When Kamp asked what was going on, Tina told Kamp what H.C. had told her, and Kamp said "awe [sic] come on" and did not take the situation seriously. Id. at 192. Kamp told Tina that the three of them needed to sit down and talk. Tina asked H.C. to come inside and told H.C. that Kamp wanted to tell her something. Kamp told H.C. that she was having a dream in the middle of the night, that he went into her room, shook her, and woke her to tell her that she was dreaming. H.C. told Kamp that he was lying. Tina then took the children and left.

Tina dropped the children off at school and returned home. When Tina returned home, Kamp told her that she should keep an eye on the sky because it looked like it was going to storm. Tina "went off," and said, You really think I'm concerned on [sic] what the weather is going to do today," and decided to leave. Id. at 195. Tina went to her sister's house and then picked up H.C. from school. Tina called Craig to tell him about the situation, and Tina and H.C. met Craig at a park. They then left the park and drove to the police station. Winamac Police Officer Mike Buchanan interviewed H.C. and videotaped the interview.

Kamp v. State, No. 66A05-0604-CR-202 (Ind. Ct. App. Mar. 20, 2007).

On April 13, 2005, Kamp was charged with child molesting, a class C felony. Thereafter, he retained Charlie Scruggs as his defense counsel. During Kamp's jury trial, Scruggs introduced the defense theme that, while admitting that Kamp's penis was in H.C.'s hand at some point, there would be no proof of the intent to arouse the sexual desire of anyone involved. Scruggs attempted to establish that the touching was not

sexual in nature because H.C. grabbed Kamp's penis when he attempted to wake her from a bad dream.

Scruggs also emphasized in his opening argument that the jurors were to look beyond the stigma of child molest allegations to determine whether proof existed to satisfy all the elements of the crime. Scruggs established during cross-examination that Kamp was wearing boxer shorts on the night of the incident and that H.C. believed that she was dreaming about Daniel Ingram on the night of the incident. Ingram knew Kamp because a friend of his mother's had been dating Kamp, and that person was H.C.'s mother.

Kamp's jury trial resulted in a verdict of guilty, and on March 14, 2006, he was sentenced to eight years in the Indiana Department of Correction (DOC).

Kamp raised several evidentiary errors, challenged the sufficiency of the evidence, and the propriety of the sentence that was imposed. In our unpublished memorandum decision, we affirmed Kamp's conviction and sentence in all respects.

On September 1, 2010, Kamp filed a petition for post-conviction relief, alleging that he was denied the effective assistance of trial counsel. In part, the petition alleged that

> Counsel for the Petitioner was quite ill at the time of trial and during pre-trial proceedings, including trial preparation. Trial counsel previously was known to have had the level of skill and competence to undertake a serious criminal trial; however, counsel was so ill that he did not perform at his usual level of skill and competence. He did not obtain discovery he typically would have obtained and that he had in fact requested and promised to obtain. During the trial, counsel was suffering from physical

4

manifestations of his illness, including but not limited to, tinnitus and headaches and was unable to perform at times. Counsel requested, but was not provided, a recess due to his illness. Counsel failed to properly prepare for trial, call witnesses and/or appropriately object, research and argue at trial. It is not believed that counsel would have failed to use his training and skill but for counsel's serious illness. Shortly after sentencing, counsel took his own life believed to be due to the intense physical suffering he had endured. All trial errors in post-conviction proceedings are now raised under ineffective assistance of counsel. Therefore, Petitioner Kamp includes all errors raised or which should have been raised at trial and in the transcript herein.

Appellant's App. p. 22.

The post-conviction court conducted an evidentiary hearing on January 27, 2011. At the hearing, Kamp testified on his own behalf and Ingram was also called to testify. Ingram testified that he saw H.C. approximately two or three times per month at the residence. However, he did not remember anything about the day that the molestation occurred, other than that he and H.C. had been watching television earlier that afternoon. Kamp was unaware that H.C. may have been having dreams about him. Ingram was not at the residence when the molestation happened, and he had not been interviewed by Kamp's trial counsel or law enforcement officials prior to trial.

Kamp also offered the testimony of Stephanie Doran, an attorney who had shared office space with Scruggs. Doran acknowledged that Scruggs had been a very competent lawyer and tended to be very thorough when preparing for trial. Although Doran and Scruggs had adjoining offices, Doran did not attend Kamp's trial, nor had she read the trial transcripts. Doran testified that she thought Scruggs's tinnitus affected his ability to

5

concentrate at times, and she believed that he was becoming more depressed in light of his physical ailments.

Scruggs's paralegal, Stephanie Blackman, testified at the post-conviction hearing that Scruggs had not been feeling well during the trial. Blackman knew that Scruggs had "a very bad headache [and] his leg was aching." Appellant's App. p. 205-06. Blackman believed that Scruggs was not putting forth his best effort at trial, and he had to "lie down in his car [at some point] because his head hurt very bad." Id.

Blackman was also familiar with Scruggs's handwriting. Blackman reviewed a Pulaski County Department of Child Services report concerning H.C., and recognized that Scruggs had made a statement in his handwriting that "FCM [Family Case Manager] informed Officer Mike Buchanan that there have been past reports of sexual abuse occurring with other siblings." Appellant's App. p. 301. Scruggs handwrote the word "deposition" with an exclamation point next to the place where Officer Buchanan's name is circled. Id. at 160. Blackman found it "extremely uncharacteristic" of Scruggs that he did not take Officer Buchanan's deposition "after that report." Id. at 163. In fact, based on her knowledge of Scruggs, Blackman found it "inexplicable" why Scruggs would not have explored that issue because the CPS report suggests that there may have been three investigations of substantiated instances of sexual abuse where H.C. resided.

On June 8th, 2005, Scruggs entered his appearance for Kamp and moved for discovery and inspection that same day. Blackman reviewed the motion and identified it

6

as the typical form of discovery motion that Scruggs would use. Scruggs also filed a motion to produce the Home Study report.

At the post-conviction hearing, Blackman was asked the following:

Q: There was a reference to prior [sic] in Exhibit 2 that you mentioned and didn't explore to three (3) prior investigation numbers with sexual abuse with substantiation dates in 2002 and 2003. Do you recall mentioning that?

A: Yes.

Q: Now is that something that Charlie would typically have investigated in a sex crime?

A: Absolutely.

Q: And why would he have done so?

A: To go to the heart of the case. The credibility of the alleged victim. The alleged victim's mother.

Q: And is that standard procedure for him in your office, when you were working for him?

A: Yes.

Q: All right.

A: I mean unfortunately, I wish I could, I can't conceive, it's just inexplicable that there was nothing further done once he received that report.

Appellant's App. p. 176.

Blackman also reviewed a motion to produce a Home Study. Kamp had advised Scruggs that a Home Study existed where there were allegations of the other sexual abuse with H.C. and her biological father and showering together.

7

On August 18th, 2005, Scruggs wrote the deputy prosecutor regarding the Home

Study, stating

> To date I have not received the case reports study, which is giving me heartburn.
>
> I need that desperately as soon as possible in order so I can give you an answer as to your plea agreement offer. Further, I will need it in order to prepare for trial and I'm quite sure there may be other evidence that will be disclosed in there that I will need to chase down.

Appellant's App. p. 637.

The Home Study was never produced prior to the trial in this matter. As a result,

Blackman was also asked:

> Q: Do you, based upon your knowledge of Charlie and this case and his Motion to Produce, are you aware of any reason why he would abandon the request for the Home Study?
>
> A: No.
>
> Q: Can you think of any conceivable strategical reason that he would do so?
>
> A: None what so ever.

Id. at 168.

At some point, the Home Study was obtained for the post-conviction proceedings.

This Home Study was conducted by attorney Michael Boonstra that involved custody

proceedings with regard to H.C. and her mother and father in the Cass Circuit Court. The

report reflects that the other child in the home had been molested by a sister's son. Also,

H.C.'s mother was complaining about the stepmother showering with the two (2) minor

boys in the home. More particularly, the report states, "this is not good since he was

8

caught molesting K. in the past." H.C.'s mother also indicated that that H.C. has allegedly showered "with [the father and stepmother]." Appellant's App. p. 624.

Although not available at trial, the CCS in Cass Circuit Court reflects that on June 26, 2009, overnight visitation was suspended in the biological father's home. The Home Study also reflected that H.C's mother had been sexually molested by her brother-in-law when she was approximately eight to ten years old.

The CCS in Kamp's case reflects that on September 8, 2005, the trial court ordered the director of Child Protective Services of Pulaski County to appear and answer why she should not be held in contempt for failing to produce a Home Study case report. Nowhere does it appear that Scruggs asked for the director of Cass County to produce such a report. On September 12, 2005, Scruggs appeared with the State and the Rule to Show Cause was dismissed because it was determined that the Home Study report was from Cass County and not Pulaski County.

Kamp called attorney Larry Hanson to testify as an expert witness. He reviewed the trial transcript and discovery including a motion to produce the Home Study that was filed on September 6, 2005. Hanson testified that the depositions Scruggs took were "woefully inadequate" and did not explore certain areas of defense. Appellant's App. p. 216. Scruggs did not inquire about "dream talking" that H.C. had been doing even though it appeared to be a rather common event. Scruggs also did not explore any apparent contradictions in the police report with regard to H.C.'s mother's deposition testimony.

9

Hanson determined that Scruggs's investigation regarding Ingram about whom H.C. had been allegedly dreaming about was inadequate. Hanson also believed that a psychologist should have been consulted because of the other allegations of sexual abuse in the home. Hanson was of the opinion that without an investigation as to this prior abuse, no conclusions could be drawn as to whether H.C. was lying, confused, or telling the truth. Hanson also was of the opinion that the depositions of Ingram, two police officers, and the investigator from CPS should have been taken.

Hanson and Blackman both testified that it was out of character for a defense attorney in a sex crimes cases not to investigate alternate explanations of abuse, especially when there was alleged prior sexual abuse in the family, and when the defendant was allegedly not sexually aroused during the event.

Following the hearing, the post-conviction court entered findings of fact and conclusions of law denying Kamp's request for relief. Some of these findings were that

### FINDINGS OF FACT

9. That Petitioner presented a witness not interviewed by the police or Petitioner's counsel, who at the time of the crime, was a teenager. This witness was present in the house the day before the molestation occurred. This witness was not present in the house when the molestation occurred.

10. Petitioner presented two witnesses who testified that counsel appeared to suffer from depression and other debilitating physical symptoms of his illness.

11. Petitioner also presented witness Larry Hanson, attorney from Hamilton County, who testified that counsel was essentially ineffective because expert witnesses were not called to challenge the voluntariness of

10

Petitioner's statement to police and to challenge the truthfulness of the victim's statement.

. . .

14. Scruggs filed a motion to continue jury trial and a motion to produce a home study report relating to the victim.

15. Scruggs appeared with Kamp at a Rule to Show Cause why Pulaski County Child Protective Services should not be held in Contempt for failing to produce a home study.

16. Scruggs negotiated two plea agreements with the State and submitted to the Court for its approval.

17. That at the trial, during voir dire, Scruggs argued that while Kamp's penis was in the hand of the victim, there would be no proof of the intent to arouse the sexual desires of anyone involved.

18. That during opening statements, Scruggs stated that there was no dispute that Kamp's penis was briefly in the victim's hand while she was in bed.

19. That Scruggs' trial strategy was to argue that the victim was having a dream about a teenage boy at the time of the incident, and while dreaming, inadvertently grabbed Kamp's penis that was exposed through his boxer shorts.

20. That through effective cross examination, Scruggs established that Kamp was wearing boxer shorts.

21. That through effective cross examination, Scruggs established the victim was dreaming about a teenage boy.

22. That through effective cross examination, Scruggs established that Kamp's penis was not erect at the time of the incident.

23. That the trial record shows that Scruggs intentionally failed to object to [Kamp's] taped statement but did not do so because Scruggs and Kamp believed the tape showed that Kamp was innocent and had nothing to hide.

Appellant's App. p. 130A.

The post-conviction court determined that Kamp failed to sustain his burden of proof that Scruggs's performance was deficient in any way. It was noted that

> Scruggs's strategy was to acknowledge that there was a touching by the juvenile of Kamp's penis, however, that touching was accidental, unintentional, and not meant to either arouse the juvenile or Kamp. With that strategy employed, Scruggs was eliminating the false confession's expert or repressed memory expert. Scruggs' apparent strategy was to tell Kamp's version of the truth, rather than to throw so many different "possible" reasons for the child to be lying, that Kamp and Scruggs look foolish to the jury. Although many attorneys do not adhere to an old but wise axiom, "Truth is your best defense," Attorney Scruggs seemed to be employing that strategy. The truth is always an objectively reasonable standard of performance. Just like any trial strategy, the jury can either believe the truth or not.
>
> Kamp has also failed to prove that he was prejudiced by his attorney's performance. <u>There is zero evidence that a different strategy would have resulted in a different outcome. Kamp only speculates that a different trial approach would result in a different outcome</u>.
>
> . . .
>
> <u>While the evidence does support that Scruggs was ill, the seriousness of the illness was not readily apparent to the Court or any casual observer</u>. Only two witnesses testified as to the severity of Scruggs' illness, and neither one was a medical expert. The witnesses, one an attorney who knew Scruggs very well and considered him a mentor, and the other his long time paralegal. . . . <u>The present case demonstrates an attorney who was able to argue pre-trial motions, opening arguments, voir dire, cross examinations, proper objections and closing arguments. Scruggs also negotiated two plea agreements that were rejected by the Court</u>.
>
> Counsel exhibited no visible signs of distress at any time either in trial preparations or during the trial other than a head ache. Counsel never sought to renew his motion for a recess because his illness was more severe nor did his paralegal express any concern to the Court or Court personnel. <u>A review of the record reveals nothing that would rise to the level . . . that Scruggs labored under circumstances that were so unfair and arbitrary that Kamp was denied his right to counsel</u>.

12

Appellant's App. p. 130 D, E (emphases added).

In denying Kamp's request for post-conviction relief, it was concluded that the evidence presented, at best, supports the idea that two other attorneys—Doran and Hanson—would have used a different trial strategy. The post-conviction court noted that neither Doran nor Hanson ever had a conversation with Scruggs about the Kamp case, and neither of them had reviewed Scruggs's original case file.

Kamp now appeals.

DISCUSSION AND DEICISION

I. Standard of Review Generally; Post-Conviction Relief

We initially observe that the petitioner in post-conviction proceedings bears the burden of establishing the grounds for relief by a preponderance of the evidence. Ind. Post-Conviction Rule 1(5); Fisher v. State, 810 N.E.2d 674, 679 (Ind. 2004). When appealing from the denial of post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment. Id. On review, we will not reverse the judgment of the post-conviction court unless the evidence as a whole unerringly and unmistakably leads to a conclusion opposite that reached by the post-conviction court. Id. Put another way, the defendant must convince us that there is "no way within the law that the court below could have reached the decision it did." Stevens v. State, 770 N.E.2d 739, 745 (Ind. 2002). A post-conviction court's findings and judgment will be reversed only upon a showing of clear error, that which leaves us with a definite and firm

13

conviction that a mistake has been made. <u>Fisher</u>, 810 N.E.2d at 679. In this review, findings of fact are accepted unless they are clearly erroneous and no deference is accorded to conclusions of law. <u>Id.</u> The post-conviction court is the sole judge of the weight of the evidence and the credibility of witnesses. <u>Id.</u>

## II. Ineffective Assistance of Counsel

In addressing Kamp's claim of ineffective assistance of counsel, we note that he must establish the two components set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). First, a defendant must show that counsel's performance was deficient. <u>Id.</u> at 687. This requires a showing that counsel's representation fell below an objective standard of reasonableness and that "counsel made errors so serious that counsel was not functioning as 'counsel' guaranteed to the defendant by the Sixth Amendment." <u>Id.</u> In other words, the standard asks whether, "considering all the circumstances," counsel's actions were "reasonable[] under prevailing professional norms." <u>Id.</u> at 688. Second, a defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, that is, a trial where the result is reliable. <u>Id.</u> To establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> at 694. A reasonable probability is one that is sufficient to undermine confidence in the outcome. <u>Id.</u> We "strongly presume" that counsel provided adequate assistance and exercised reasonable

professional judgment in all significant decisions. McCary v. State, 761 N.E.2d 389, 392 (Ind. 2002).

Additionally, counsel is to be afforded considerable discretion in the choice of strategy and tactics. Timberlake v. State, 753 N.E.2d 591, 603 (Ind. 2001). Counsel's conduct is assessed based upon the facts known at the time and not through hindsight. State v. Moore, 678 N.E.2d 1258, 1261 (Ind. 1997). We do not "second-guess" strategic decisions requiring reasonable professional judgment even if the strategy in hindsight did not serve the defendant's interests. Id. In other words, trial strategy is not subject to attack through an ineffective assistance of counsel claim, unless the strategy is so deficient or unreasonable as to fall outside of the objective standard of reasonableness. Autrey v. State, 700 N.E.2d 1140, 1141 (Ind. 1998).

In addition to the standard of review set forth above, Kamp maintains that he is also seeking review and is entitled to relief pursuant to the United States Supreme Court's decision in United States v. Cronic, 466 U.S. 648 (1984). Kamp alleges that in accordance with Cronic, he does not believe that it is necessary to show prejudice because Scruggs's illness made him effectively unavailable to assist Kamp.

More particularly, in Cronic, the United States Supreme Court recognized a narrow exception to the Strickland requirement that a defendant who asserts ineffective assistance of counsel must demonstrate that the deficiency prejudiced the defense. Florida v. Nixon, 543 U.S. 175, 190 (2004). Cronic established that a presumption of prejudice was appropriate in "circumstances that are so likely to prejudice the accused

15

that the cost of litigating their effect in a particular case is unjustified." Cronic, 466 U.S. at 658. As our Supreme Court explained in Conner v. State, 711 N.E.2d 1238 (Ind. 1999):

> The Cronic Court identified three situations that would justify this presumption [of prejudice]: (1) when counsel is completely denied; (2) when counsel entirely fails to subject the prosecution's case to meaningful adversarial testing; and (3) when surrounding circumstances are such that, "although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial.

Id. at 1254-55.

In support of his ineffective assistance of counsel claims, Kamp directs us to paralegal Blackman's post-conviction hearing testimony. Blackman recounted the incident about the bombing of the Howard County courthouse in the 1980s and described how it had affected Scruggs. Blackman observed that Scruggs walked with a limp because shrapnel could not be removed from his leg, his neck had been broken twice, and the bombing caused him to suffer from tinnitus.

Two or three years prior to Scruggs's death, Blackman noticed significant medical changes in Scruggs' health. For instance, Scruggs became depressed in light of his physical ailments and Blackman believed that the tinnitus affected Scruggs's ability to concentrate at times. Blackman testified that Scruggs suffered headaches during the trial and thought that he was probably not "putting forth his best effort" at trial. Appellant's App. p. 205-06.

16

Also, Doran found it very uncharacteristic that Scruggs did not depose one of the police officers in response to prior reports of alleged sexual abuse involving H.C. and her other siblings. Doran believed that Scruggs typically would have investigated prior allegations of sexual abuse in the victim's home.

Kamp also points out that Scruggs failed to request a Home Study that had been generated regarding prior instances of child molesting of H.C. When the Home Study had been obtained in time for the post-conviction hearing, it contained allegations that H.C. had been showering with her father and stepmother. Overnight visitation had been suspended in the biological father's home. Kamp alleged that Scruggs never asked personnel in Cass County to produce the report.

As noted above, attorney Hanson testified as an expert witness for Kamp. He reviewed the transcript and discovery, including Scruggs's motion to produce the Home Study that had been filed on September 6, 2005. Hanson was of the opinion that the depositions Scruggs had taken were "woefully inadequate" and did not explore various theories of defense. Appellant's App. p. 216. More particularly, Scruggs did not inquire about H.C.'s dream and did not explore the contradictions in the police report with regard to the mother's deposition testimony. Hanson also believed that Scruggs should have consulted a psychologist in light of the other allegations of sexual abuse in the home. Hanson also thought that Scruggs should have taken additional depositions.

In light of these circumstances, Kamp maintains that Scruggs was unable to make reasonable strategic decisions and was unable to assist Kamp in preparing and trying the

17

case.   Kamp asserts that the evidence at the post-conviction hearing establishes that Scruggs was not functioning as he normally did and did not conduct the investigation and trial as he typically did when he was healthy.

Notwithstanding Kamp's contentions, the record demonstrates that Kamp has failed to show that  1) defense counsel was completely denied; 2) trial counsel entirely failed to subject the State's case to meaningful adversarial testing; and (3) the surrounding circumstances made it impossible for even a fully competent attorney to provide effective assistance.

Indeed, Scruggs entered his appearance for Kamp and immediately filed motions for discovery and inspection.  Scruggs also filed a motion to continue the jury trial and a motion to produce a Home Study that related to H.C.  Scruggs represented Kamp at a "Rule to Show Cause Why Pulaski County Child Protective Services Directors Should not be held in Contempt for Failing to Produce a Home Study," and negotiated with the State two plea agreements on Kamp's behalf which, apparently, were far more favorable to Kamp than a conviction but were rejected by the trial court.   Appellant's App. p. 3-4.

Scruggs conducted voir dire with the theme that while admitting that Kamp's penis was in H.C.'s hand, the State would not be able to establish any proof of intent to arouse the sexual desire of anyone involved.  Tr. p. 60-63, 81-82, 93-98, 125-26, 132. **As noted above,** Scruggs commented in his opening statement that there would be no dispute that Kamp's penis was briefly in H.C.'s hand while she was in her bed.  Id. at 171-72.  However, Scruggs further contended that the evidence at trial would show that

18

the touching was not sexual and merely accidental because H.C. grabbed Kamp's penis when he attempted to wake her from a bad dream. Id. at 171. Scruggs stated that the evidence would show that H.C. was confused about the events as was evident from her admission that she was dreaming and her confusion about what Kamp was wearing and how long the event lasted. Id. at 171-73; 219-20.

Scruggs also cross-examined H.C., and she contradicted herself at times about the timing of the events. Moreover, Scruggs was able to establish that H.C. was dreaming about Ingram when the incident occurred and that Kamp was wearing floor length pajama pants, which was inconsistent with H.C.'s mother's testimony. Id. at 219.

Scruggs cross-examined the police officers and sought to exclude the admission of H.C.'s videotaped statement. Scruggs argued and cited case law in an attempt to prevent the jurors from reviewing Kamp's videotaped statement. Scruggs also established that Kamp's penis was not erect at the time of the incident and that he cooperated with the investigation and never requested counsel to represent him. Id. at 264-65.

In light of the above, it is apparent that Scruggs established Kamp's defense by presenting evidence at trial that the touching was only brief and nonsexual in nature. That said, Hanson, Doran, and Blackman merely speculate that a different defense strategy may have been more successful than the one Scruggs invoked. In other words, none of these witnesses could suggest a defense or strategy other than the one that Scruggs presented that would have guaranteed success.

19

The record also shows that Scruggs presented closing arguments and argued final instructions. During closing argument, Scruggs maintained that there was no evidence that the touching occurred because of a sexual desire, and nothing more than an accidental and brief touching had occurred. Scruggs also pointed out that Kamp had been honest with the police, while H.C. had been confused and inconsistent. Tr. p. 293-302.

Following the jury's verdict, Scruggs requested that Kamp's bond be continued pending sentencing. Scruggs also submitted a sentencing memorandum, argued on Kamp's behalf at the sentencing hearing, and moved for a mistrial. Tr. p. 343-63.

When examining these circumstances, Kamp has failed to show that Scruggs was "effectively unavailable" to assist him. Appellant's Br. p. 18. In other words, Kamp has fallen far short of establishing that Scruggs failed to subject the State's case to meaningful adversarial testing. Therefore, the Cronic presumption of prejudice does not apply in these circumstances. We also point out that Kamp's claim of ineffective assistance of trial counsel fails under Strickland.

In addition to the above claims, Kamp asserts that Scruggs was ineffective for failing to locate a Home Study from Cass County that was admitted as an exhibit at the post-conviction hearing. However, the record shows that Scruggs filed a motion for discovery and inspection on June 9, 2005, and subsequently sent a letter to the State requesting the Home Study on August 18, 2005. Ex. 8. After filing the motion to produce, the trial court set the matter for a contempt hearing as to whether the Director of

20

the Pulaski county Child Protective Services should not be held in contempt for failing to produce the Home Report.

The record indicates that Scruggs did not locate the Home Study because it was conducted in Cass County rather than in Pulaski County. Thus, the rule to show cause hearing was dismissed. Moreover, we note that the report that was finally discovered contains an unsubstantiated claim that H.C. had showered with her father or step-mother. And the Home Study makes no reference or claim of sexual molestation of H.C. in Kamp's case.

The record suggests that discussion of a Home Study occurred between Scruggs and Kamp, but the source of the report was represented to be Pulaski County. Under these circumstances, it is apparent that Scruggs did all that a competent counsel is expected to do to attempt and locate the relevant report. See Rondon v. State, 711 N.E.2d 506, 518 (Ind. 1999) (holding that counsel was not ineffective for failing to uncover evidence beyond that provided by the State in discovery). Additionally, nothing in the report that was presented indicated any relevance to the claims between Kamp and the H.C., and Kamp has failed to show how the information contained in the report would have changed the result of the trial. Kamp also has not shown what an investigation of any alleged prior abuse would have revealed that might have been admissible at trial. As a result, Kamp has failed to establish deficient performance on this issue.

In a related argument, Kamp appears to be claiming that Scruggs was ineffective for failing to investigate prior sexual abuse that allegedly occurred in the home.

21

However, Kamp does not specify who was involved in the alleged prior abuse, and he has not established what an investigation of this alleged prior abuse would have shown or demonstrated. Moreover, Kamp has not shown what, if any evidence that might have been produced, would have been admissible at Kamp's trial. Even more compelling, Kamp has failed to show that Scruggs, in fact, did not investigate the alleged prior abuse. Indeed, Doran, who produced Scruggs's file at the post-conviction hearing, acknowledged that it was probably not the entire file. Doran also admitted that she could not testify that every document relating to Scruggs's work was included in the materials that were offered to the post-conviction court. Tr. p. 47. In light of these circumstances, Kamp has failed to prove (a) that counsel failed to investigate this issue and (b) that an investigation would have produced admissible evidence that would have had a reasonable probability of affecting the outcome of this case.

Given these circumstances, it cannot be said that the evidence as a whole leads unerringly and unmistakably to a conclusion that is opposite of that reached by the post-conviction court. Even though there was testimony that Scruggs may not have performed in accordance with his usual skill and competence at Kamp's trial, Scruggs's actions were reasonable under the prevailing professional norms. Strickland, 466 U.S. at 688. In other words, Kamp has failed to convince us that there was "no way" within the bounds of the law that the post-conviction court "could have reached the decision that it did." Stevens, 770 N.E.2d at 745. Thus, we affirm the denial of Kamp's petition for post-conviction relief.

22

The judgment of the post-conviction court is affirmed.

DARDEN, J., and BAILEY, J., concur.